**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BODUM USA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07 C 6302 |
| ) | |
| LA CAFETIÈRE, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Bodum USA, Inc. has sued La Cafetière, Inc., for infringement of its trade dress in violation of 15 U.S.C. § 1125(a), common law unfair competition, and violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2(a). Bodum alleges that La Cafetière sold, promoted, and advertised products that were imitations of Bodum's distinctive "Chambord" trade dress. La Cafetière has moved for summary judgment on two distinct grounds. First, La Cafetière contends that a 1991 stock purchase agreement authorizes its activities. Second, it contends that the suit is barred by the doctrines of laches and equitable estoppel.[1] For the reasons set forth below, the Court grants the first motion and denies the second as moot.

---

[1]The Court will refer to documents relating to the motion based on the 1991 stock purchase agreement with the designation "SPA" and documents relating to the motion based on laches and equitable estoppel with the designation "Laches."

1

## Background

On a motion for summary judgment, the Court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

Bodum and La Cafetière manufacture and distribute French-press coffee makers. A French-press coffee maker is a non-electric device, consisting of a carafe and a mesh plunger attached to a lid, that brews coffee using hot water. The user mixes coffee grounds and water in the carafe and then, after allowing the coffee to brew, pushes down on the plunger. The plunger presses the grounds to the bottom of the carafe, leaving freshly brewed coffee at the top.

Beginning in the 1950s, Société des Anciens Etablissements Martin S.A. ("Martin") distributed a very successful French-press coffee maker called the Chambord. Martin owned the design patent for the device, as well as a trademark in the Chambord name, and it also owned the rights to the Melior design and trademark, another well-known French-press model. Louis-James De Viel Castel was the majority shareholder of Martin from at least the 1980s.

In 1983 Mr. Viel Castel and Jørgen Jepsen Bodum joined with another individual to establish Bodum, Inc. Bodum, Inc. acquired the rights to distribute the Chambord design in the United States pursuant to an oral license agreement between Peter Bodum A/S and Martin. By 1991, Bodum-related entities had acquired all the shares of Bodum, Inc.

Prior to 1991, Household Articles Limited, a company registered in the United Kingdom and owned by Viel Castel, distributed French-press coffee makers in the U.K. One of its products, sold under the name "La Cafetière," was similar to Martin's Chambord. Bodum contends that this model "embodied the Chambord design." SPA Resp. at 3.

In 1991, Bodum Holdings purchased all of the shares of Martin pursuant to a stock purchase agreement. Negotiations for the contract went on for some time. Early in the negotiations Mr. Viel Castel, Martin's majority shareholder, insisted that any agreement place no restrictions on the activities of Household. Mr. Bodum discussed this matter with Mr. Viel Castel during negotiations and "was satisfied with the answers he received on questions regarding" Household. SPA Resp., Ex. 4H at LaCaf00918. Bodum contends that Mr. Bodum understood that Household would be restricted to its then-current market share, which he thought was the U.K. and a limited presence in Australia.

Article Four of the initial draft of the agreement, dated July 19, 1991, provided that:

> In consideration of the compensation paid to Stockholder for the stock of [Martin,] Stockholder guarantees that he shall not—for indefinite period of time—be engaged directly or indirectly in any commercial business related to manufacturing or distributing [Martin's] products. . .
>
> Notwithstanding article 4 [Bodum Holdings] agrees that Stockholder through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly to distribute products outside the United Kingdom.

3

SPA Mot. at 16-17. These passages make up the first and fourth paragraphs of Article Four. The next draft of the agreement, dated July 24, 1991, changed the limitation period to five years and replaced the fourth paragraph with the following language:

> Notwithstanding Article 4 [Bodum Holdings] agrees that Stockholder through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly to distribute products outside the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, globally to manufacture and/or distribute coffee-pots under the trade marks and/or brand names of "Melior" and "Chambord". [Bodum Holdings] agrees that Household [ ] with the limitation mentioned in the previous sentence outside of the United Kingdom on markets where Household [ ] prior to signing of this Agreement has proved to [Bodum Holdings] that he is already manufacturing/distributing products can manufacture and distribute products which, directly or indirectly, do not compete with the business of the Company as run to-day.

*Id.* at 17.

The next draft, also dated July 24, 1991, reflected another change. The restriction limiting Household to the U.K. and other markets in which it could prove it had established a presence was replaced with a new restriction, which stated that Household "can manufacture any products similar to [Martin's] products outside of France." *Id.* at 18. The new draft specified, however, that Household was prohibited from any such activity in France. This draft also stated that Household was prohibited from using any Martin importers or distributors for five years.

The final version of Article Four reflected additional changes:

> In consideration of the compensation paid to Stockholder for the stocks of [Martin,] Stockholder guarantees, limited to the agreed compensation, see Article 2, that he shall not—for a period of four (4) years—be engaged directly or indirectly in any commercial business related to manufacturing or distributing [Martin's] products. . .
>
> Notwithstanding Article 4 [Bodum Holdings] agrees that Stockholder through Household . . . can manufacture and distribute any products similar to [Martin's]

4

products outside of France. It is expressly understood that Household [ ] is not entitled, directly or indirectly to any such activity in France, and that Household [ ] furthermore is not entitled, directly or indirectly, globally to manufacture and/or distribute coffee-pots under the trade marks and/or brand names of "Melior" and "Chambord" held by [Martin]. Stockholder agrees that Household [ ] is not entitled to use for a period of four (4) years the importers, distributors, and agents which [Martin] uses and/or has used the last year. Any violations of these obligations will constitute a breach of Stockholder's obligations according to Article 4.

SPA Mot. Ex. 4 at LaCaf00624-25. Bodum Holdings paid 13.2 million French francs for the Martin shares.

La Cafetière contends that beginning in 1990, Household continuously sold its "La Cafetière" model, later named the "Classic," in the United States. Bodum contends that any sales made by Household in the United States were *de minimis* and that it was unaware of such sales.

In 2006, Brian Noon filed La Cafetière's articles of incorporation in Illinois. In January 2008, Household acquired Mr. Noon's shares of La Cafetière. La Cafetière contends that Household and Mr. Noon had intended to transfer ownership since the time of La Cafetière's incorporation. Bodum contends that Household hired Mr. Noon to conduct a market survey and establish a market presence in the United States. La Cafetière contends that it engaged Mr. Noon to establish the entity because it was dissatisfied with its U.S. distributors and felt that the U.S. market was large enough to support a separate entity.

Bodum contends that La Cafetière actively targeted Bodum customers. La Cafetière contends that it targeted customers generally, not with the purpose of stealing Bodum's business. Bodum further contends that La Cafetière did not market or sell French-press coffee makers in the United States prior to its incorporation. La Cafetière

5

disputes this and contends that predecessor and related entities did market and sell the same Classic model in the U.S. that Bodum now accuses of infringing its trade dress.

## Discussion

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Bilthouse v. United States*, 553 F.3d 513, 514-15 (7th Cir. 2009). The interpretation of a contract is generally a matter to be determined by the Court as a matter of law. *See People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223, 843 N.E.2d 259, 268 (2006).[2] Courts may sometimes consider extrinsic evidence to determine the intent of contracting parties at the time the contract was made. *Bank of Ravenswood v. Polan*, 256 Ill. App. 3d 470, 474, 628 N.E.2d 194, 198 (1993). If consideration of extrinsic evidence is appropriate and the parties' intent can only be determined by resort to facts in dispute, then the meaning of the contract must be determined by a jury. *Id.*; *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 727 (7th Cir. 1996). Nevertheless, "[i]f the intent of the parties can be determined from facts not in dispute, then the meaning of the contract can be determined as a matter of law," even when extrinsic evidence must be used to construe the contract. *McElroy*, 73 F.3d at 727 (citing Illinois cases).

La Cafetière contends that it is entitled to sell the accused products in the United States by virtue of the 1991 stock purchase agreement between Martin stockholders

---

[2]The Court refers to Illinois cases in this context to determine whether summary judgment would be appropriate when extrinsic evidence is used to construe a contract. *See Harrell v. United States*, 13 F.3d 232, 235 (7th Cir. 1993) (federal courts often use state law to fill in the gaps in federal statutes, unless the state law would defeat the purposes of the federal statute).

and Bodum Holdings. La Cafetière contends that the agreement granted Household Articles the right to sell products similar to Bodum's Chambord line outside of France. If that is so, La Cafetière is entitled to summary judgment on Bodum's trade dress claims, because an activity authorized by contract cannot constitute a "'false designation of origin, false or misleading description of fact, or false or misleading representation of fact,'" violative of the Lanham Act. *Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1035 (D. Minn. 2003) (quoting 15 U.S.C. § 1125(a)(1)). Bodum contends that the stock purchase agreement merely clarifies that Household would be permitted to carry on selling products similar to—but not identical to—the Chambord line. In other words, Bodum argues, the contract was meant to maintain the status quo with respect to the market share of both Martin's Chambord and Household's Classic.

Determination of which of these competing contentions is correct depends on the interpretation of the stock purchase agreement, which both parties agree is governed by French law.

**A.    French law**

Federal Rule of Civil Procedure 44.1 authorizes courts to determine issues governed by the law of a foreign country. Fed. R. Civ. P. 44.1. "The Court has great discretion in choosing source materials when the application of foreign law is necessary." *Zurich Capital Markets, Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1053 (N.D. Ill. 2005) (citing *Pittway Corp. v. United States*, 88 F.3d 501, 504 (7th Cir. 1996)). Although "expert testimony accompanied by extracts from foreign legal material is the preferred methodology by which foreign law is determined," *Labuda v. Schmidt*, No. 04

7

C 1281, 2005 WL 2290247, at *6 (N.D. Ill. Sept. 19, 2005) (collecting cases), the Court is "free to disregard expert affidavits under Rule 44.1" and "reach its own decision based on an independent examination of foreign legal authorities." *Zurich*, 383 F. Supp. 2d at 1053. Both parties have submitted opinions by experts who largely agree on the principles of French contract law but differ somewhat in the application of those principles to the case.

Article 1156 of the French Civil Code emphasizes intent over text in contract interpretation. "One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms." C. Civ. Art. 1156. Thus even if a contract is unambiguous on its face, a court may consider parol evidence, such as prior drafts and contemporaneous communications between the parties, to determine the parties' intent. *See* SPA Mot. Ex. 9 at 5 (expert opinion of Professor Jérôme Huet); SPA Resp. Ex. 7.N. at 7 (expert opinion of Professor Pierre-Yves Gautier, relying on prior drafts and correspondence between the parties in analysis). The primacy of intent is again emphasized in Article 1163, which provides that "[h]owever general the terms in which an agreement is phrased may be, it shall include only the things upon which the parties appear to have intended to contract." C. Civ. Art. 1163.

Several other provisions of the French Civil Code likewise apply to the Court's analysis. Article 1157 provides that "[w]here a clause admits of two meanings, one shall rather understand it in the one with which it may have some effect, than in the meaning with which it could not produce any." C. Civ. Art. 1157. This is similar to the principle in American contract law that "meaning and effect must be given to every part

8

of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary." *INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 500 (7th Cir. 2009) (internal quotation marks and citations omitted). In addition, Article 1602, a provision relating to sales contracts, states that a seller "is obligated to explain clearly what he binds himself to," and that "[a]ny obscure or ambiguous agreement shall be interpreted against the seller." C. Civ. Art. 1602.

**B.    Final language of the stock purchase agreement**

The 1991 stock purchase agreement set restrictions on the future commercial activities of Martin stockholders. Specifically, the first paragraph of Article Four provided that the stockholders promise "that [they] shall not for a period of four years—be engaged directly or indirectly in any commercial business related to manufacturing and/or distributing of the Company's products . . . ." SPA Mot., Ex. 4 at LaCaf00624.

The last paragraph of Article Four, however, expressly permits the stockholders, through Household, to "manufacture and distribute any products similar to [Martin's] products outside of France." *Id.* at LaCaf00625. This paragraph further clarifies that Household "is not entitled to" manufacture or distribute such products in France and is prohibited from manufacturing or distributing any products under the names Chambord or Melior anywhere in the world. It also provides that Household may not use any of Martin's importers, distributors, and agents for four years.

Bodum contends that Article Four, in its entirety, amounts to a non-compete agreement and that it conferred no license or rights on Household use the Chambord trade dress. La Cafetière contends that the agreement provided Household with the

9

right to continue its own marketing and distribution so long as Household did not enter the French market or use the Chambord or Melior names.

**C.     Evidence of intent**

As noted earlier, French law allows the Court to look beyond the four corners of the agreement even if it is not ambiguous.  The parties derive conflicting interpretations of the contract from the course of the negotiations, the communications between Bodum Holdings and Mr. Viel Castel, and the state of affairs at the time.

Bodum argues that the evidence shows that the parties intended to preserve the status quo with respect to each company's market share.  Specifically, it contends that prior drafts of the contract support Mr. Bodum's testimony that he believed Article Four restricted Household's activities to the British market in which it already had established sales.  With the exception of Mr. Bodum's testimony, however, the evidence does not support Bodum's position.

**1.     Drafts of the 1991 Agreement**

The progression of drafts and communications between the two parties reflects a gradual loosening of the geographic restrictions on Household's activities, along with a tightening of restrictions on its use of the Chambord and Melior marks.  The first draft of the contract provided that Household was entirely prohibited from distributing products outside the United Kingdom.

The second draft provided that Household was entitled to distribute outside the U.K., specifically in "markets where [Household] prior to signing of this Agreement has proved to [Bodum] that [it] is already manufacturing/distributing products . . . which,

directly or indirectly, do not compete with the business of [Martin] as run to-day." SPA Mot. at 17. In addition, the draft added for the first time a prohibition on Household's use of the names Chambord and Melior. This particular draft appears to have been aimed at maintaining the status quo, as it specifically limits Household to the markets in which it can prove it has established a presence.

The July 24, 1991 draft, however, completely did away with the established-market restriction and instead stated that Household "can manufacture any products similar to [Martin's] products outside of France." *Id.* at 18. The draft specified that Household "is not entitled to any such activity in France, and that [Household] furthermore is not entitled, globally to manufacture and/or distribute coffee pots under the trademarks and/or brand names of 'Melior' and 'Chambord.'" *Id.* In short, this draft loosened the geographic restrictions, while keeping the trademark restrictions in place. The final version of the agreement left Article Four largely untouched, except that it reduced the noncompete period to four years.

### 2. Contemporaneous communications between the contracting parties

A letter dated July 24, 1991 from Mr. Bodum's representative to Mr. Viel Castel's representative confirmed that the July 24 version of the contract had been redrafted to reflect Mr. Bodum's knowledge about Household's activities. Specifically, Mr. Bodum knew Household was "selling on the English market, and . . . that a few articles ha[d] been sold in Australia." SPA Resp. Ex. 4.I. at LaCaf00914. Mr. Bodum, however, knew "nothing of activities outside those two markets." *Id.* Bodum contends that this letter indicates that the parties intended to keep Household's activities limited to places where

11

it was already established.  The July 24 draft, however, reflects a marked departure from the prior draft's language, which clearly expressed the U.K.-only limitation.  The letter confirms that the revised language reflected Mr. Bodum's understanding of Household's activities.  The letter and draft indicate a clear intent to eliminate the restriction limiting Household to the U.K. market.

Bodum also contends that the minutes of meeting held on July 3, 1991 demonstrate that the Mr. Bodum understood that Household would be permitted to sell housewares in England only.  That document, however, states only that Mr. Bodum was satisfied with the answers he received about Household.  In any event, that meeting occurred three weeks before the July 24 draft, which significantly changed the language of the agreement.

An earlier letter from Mr. Viel Castel's representative to Mr. Bodum's representative further supports La Cafetière's position that the parties intended to allow Household to distribute products anywhere outside France, so long as it did not use the Melior or Chambord brand names.  In a letter dated June 16, 1991, Mr. Viel Castel stated that an agreement would be acceptable only if it did not limit Household's activities.  Mr. Viel Castel also stated that the current offer undervalued both the importance of the Chambord and Melior names in the industry and the company's market share in France.  This letter, combined with the progression of draft agreements, reflects an intent to loosen geographic restrictions on Household while protecting Bodum's newly acquired brand names.

Bodum contends that Mr. Bodum's declaration that he understood that Household would be limited to the U.K. and perhaps Australia demonstrates that the

12

parties did not intend to allow Household to distribute Chambord-style coffee makers in the Unites States. Mr. Bodum's declaration contradicts the logical progression of the contract negotiations. *McElroy v. B.F. Goodrich* is instructive on this point. In that case, the Seventh Circuit affirmed summary judgment on a breach of contract claim where the plaintiff's subjective reading of the contract did not coincide with a common sense interpretation. *McElroy*, 73 F.3d at 725-27. The contract at issue in that case provided the plaintiff with the right to buy tire molds at their scrap value if the defendant ever "permanently discontinue[d] production" of the tires. *Id.* at 723. The plaintiff contended that the defendant's sale of the molds to another company invoked this provision. The court disagreed, finding that a common sense reading of the contract as a whole negated the plaintiffs' contention. *Id.* at 727. "A trial might establish that [the plaintiff] really did want to get the molds back if [the defendant] sold [them], but he has presented no evidence that [the defendant] acceded to his desire." *Id.* Similarly, the common sense reading of the contract drafts and the contemporaneous correspondence in this case reveal an intent to allow Household to distribute anywhere outside of France. A trial might establish that Mr. Bodum wanted to keep Household restricted to the English market, but the evidence would not allow a reasonable jury to find that the Martin shareholders agreed with him. In the face of this evidence, Mr. Bodum's declaration that both parties intended for Household to be limited only to places where it was already selling the Classic in 1991 does not give rise to a genuine issue fo material fact.

Bodum contends that even if the agreement permitted Household to sell *similar* products in the United States, it did not grant Household the right to sell products *identical* to the Chambord line.  The first paragraph of Article Four broadly prohibits the stockholders from distributing any of Martin's products.  The fourth paragraph allows Household to distribute "any products similar to [Martin's] products."  SPA Resp. at 4.  Bodum contends that these two provisions, when read together, indicate that Household was permitted to distribute housewares generally so long as it did not distribute Chambord-style coffee makers.  This interpretation, however, conflicts with Bodum's argument about the geographic restrictions.  Bodum concedes that Household was selling the Classic in England.  Bodum also concedes that La Cafetière's depiction of the Classic as sold in February 1991 is accurate.  Although Bodum disputes the extent of Household's sales of the Classic, it has not denied that it was aware that Household was selling the Classic prior to 1991.  Nor has Bodum presented any evidence to contradict La Cafetière's contention that the Classic was Household's most important and best-selling product in 1991.  No reasonable jury could conclude that Bodum was unaware that Household sold a product in England and perhaps elsewhere that "embodied the Chambord design."  SPA Resp. at 3.

Bodum also argues that the purchase price of 13.4 million French francs indicates that Bodum Holdings could not have intended to let the stockholders retain such valuable intellectual property rights.  La Cafetière contends that ten million of the thirteen million went toward real estate and receivables.  The minutes from the July 3 meeting cited by Bodum supports La Cafetière's contention.  SPA Resp. Ex. 4.H. at LaCaf00916.  La Cafetière further contends that the price of 3.4 million French francs

(about $500,000) was commensurate with the valuable right Bodum Holdings gained to exclusive use of the Melior and Chambord trademarks. Bodum Holdings also achieved the permanent exclusion of Household as a competitor in France, which both parties acknowledge was an important market for French-press coffee makers. No reasonable jury could conclude that the price was so out of proportion with the rights Bodum Holdings acquired that the parties must have intended a different result.

Bodum contends that La Cafetière's interpretation of the contract renders inoperative the first paragraph of Article Four of the contract, in violation of Article 1157 of the French Civil Code. This is not so. The first paragraph prohibits all stockholders from competing against Bodum Holdings in any way for four years. Although Mr. Viel Castel was the majority stockholder, Martin's stock was held by nine individuals. The fourth paragraph provided an exception only for Household, Mr. Viel Castel's company, to sell similar products outside of France.

Bodum contends that Article 1602 of the French Civil Code demands that the contract be construed against La Cafetière as the seller. Article 1602 provides that ambiguities are to be construed in favor of the buyer. The Court has found that the agreement is not ambiguous. As a result, Article 1602 is inapplicable.

Because the stock purchase agreement, when read in conjunction with the prior drafts and correspondence between the parties, reflects an intent to permit Household to distribute products very similar to Martin's products, the provision constitutes an agreement allowing Household's utilization of the Chambord trade dress in those products so long as Household does not use the names Melior or Chambord, and remains out of the French market. *See* SPA Mot. Ex. 9 at 8 (expert opinion of

15

Professor Jérôme Huet, stating that the stock purchase agreement could be construed as an agreement by Bodum not to oppose Household's use of certain intellectual property rights). As a result, Bodum's claims fail as a matter of law.

## Conclusion

For the foregoing reasons, the Court grants La Cafetière's motion [docket no. 34] for summary judgment based on the 1991 stock purchase agreement and denies as moot its motion concerning equitable estoppel and laches [docket no. 44]. The Court directs the Clerk to enter judgment in favor of defendant.

                                              MATTHEW F. KENNELLY
                                              United States District Judge

Date: March 24, 2009